# IN THE COURT OF APPEALS OF IOWA

No. 16-1860
Filed January 25, 2017

**IN THE INTEREST OF M.S., R.M., and K.M.,**
**Minor Children,**

**R.M., Father,**
        Appellant,

**T.M., Mother,**
        Appellant.

_____

Appeal from the Iowa District Court for Mills County, Gary K. Anderson, District Associate Judge.

A mother appeals the termination of her parental rights to her three children; the father of the two younger children also appeals. **REVERSED AND REMANDED ON BOTH APPEALS.**

Jon J. Narmi, Council Bluffs, for appellant father.

DeShawne L. Bird-Sell of Sell Law, P.L.C., Glenwood, for appellant mother.

Thomas J. Miller, Attorney General, and Kathrine S. Miller-Todd (until withdrawal) and Mary A. Triick, Assistant Attorneys General, for appellee State.

Abby L. Davison of the Office of the State Public Defender, Council Bluffs, guardian ad litem for minor children.

Considered by Vogel, P.J., and Tabor and Mullins, JJ.

**TABOR, Judge.**

A mother and father appeal the juvenile court's order terminating their parental rights. This appeal involves three children—eight-year-old M.S., four-year-old R.M., and two-year-old K.M. Tera is the mother of all three children. Robert is the father of the two youngest children.[1] Both parents argue the State did not present clear and convincing evidence to support the statutory grounds for termination, the Iowa Department of Human Services (DHS) did not provide reasonable efforts for reunification, and termination was not in their children's best interests. Tera also argues the court should have granted her additional time to work towards reunification. After independently reviewing the record,[2] we find the State failed to prove with clear and convincing evidence any of the alleged grounds for termination. Accordingly, we reverse the judgment of the juvenile court.

## I.    Facts and Prior Proceedings

The DHS first began providing services to this family in September 2013, before K.M. was born, after finding the home full of unwashed clothing, spoiled food, and dirty dishes. All the utilities had been shut off. In an interview with a DHS social worker, Tera admitted using marijuana; Robert was using methamphetamine. The DHS temporarily removed M.S. and R.M. to their

---

[1] M.S.'s biological father is deceased.
[2] Our review of termination-of-parental-rights proceedings is de novo. *See In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). Although we are not bound by the fact-findings of the juvenile court, we do give them weight, particularly when evaluating witness credibility. *See id.* Proof of the grounds for termination must be clear and convincing. *Id.* Evidence is "clear and convincing" when there are no "serious or substantial doubts as to the correctness [of] conclusions of law drawn from the evidence." *Id.* (alteration in original) (quoting *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010)).

grandparents' home, but the children returned to their parents' care in November 2013 after Tera and Robert agreed to voluntarily participate in services.

After K.M.'s birth, Tera and Robert continued to struggle with the issues that first prompted DHS involvement. In January 2015, the three children were briefly removed from Tera and Robert's care after a child protective worker again observed unsanitary conditions in the home and found Tera and Robert were regularly leaving M.S. and R.M. in a locked bedroom. Then on March 23, 2015, the children were removed after Tera and Robert tested positive for illegal substances. Both Tera and Robert tested positive for methamphetamine and amphetamines; Tera also tested positive for barbiturates and marijuana. At the time of their removal, the children "were wearing dirty clothes and obviously in need of a bath." The children have consistently been in foster or shelter care since that time. The juvenile court adjudicated the children CINA under Iowa Code section 232.2(6)(c)(2) and (6)(n) (2015) on May 11, 2015.

Following the children's removal, the court ordered Tera and Robert to participate in a number of services: family safety, risk, and permanency (FSRP) services, chemical-dependency and psychological evaluations, random drug testing, parenting assessments, and the programs and treatment recommended as a result of the evaluations and assessments. The DHS offered supervised visitation with the children. Although Tera and Robert regularly exercised their allotted visitation, their participation in the other services recommended by the DHS was less consistent.

Tera and Robert attributed their inconsistency to their lack of a working vehicle. The DHS required some of the court-ordered services, such as drug

testing, to be completed in Council Bluffs, a town nearly thirty miles away from Tera and Robert's home in Glenwood.[3] No bus service ran between the towns. Tera explained:

> It does take time to be able to find rides. We are only given 24-hour notice to find rides to our drug screens, and we've had people that they are willing to take us but then back out at the last minute. We wouldn't have rides, so we wouldn't be able to go.

Nor could Tera and Robert afford to have their vehicle fixed. Neither of them was employed, and they relied on Robert's Social Security income, which he reportedly had received since shortly after his birth due to developmental delay, and other governmental assistance to meet their needs. Of the approximately fifty scheduled drug screens between March 2015 and September 2016, Tera submitted eight samples and Robert submitted nine.

In an attempt to accommodate the parents, the DHS allowed them to use drug patches rather than submit to random drug screens, but Tera and Robert still had to travel to Council Bluffs to have the patches attached and removed. The DHS offered no other transportation-related assistance to the parents to complete the court-ordered requirements, but because R.M. and K.M. were placed in homes outside of town, an FSRP worker provided transportation for visitation.[4]

The State filed a petition for the termination of parental rights of both parents on August 31, 2016, alleging termination under Iowa Code section

---

[3] It is unclear in the record what other court-ordered services had to be completed in Council Bluffs. Tera's psychological evaluation was completed in Council Bluffs. Tera also reported no parenting classes were offered in Glenwood, so she and Robert would have to travel to Council Bluffs to complete that requirement.

[4] Tera asked to have the children moved to a home within the county, but the FSRP worker denied the request because she felt it could negatively affect the children to move to a new family.

232.116(1)(d), (e), and (f). By the time of the October 5 termination hearing, Tera had completed a substance-abuse evaluation, mental-health evaluation, and parenting assessment. Although Tera had yet to complete a drug test free of illegal substances, she had not tested positive for methamphetamine in several months, and her levels of THC had decreased in the drug screens she completed leading up to the hearing. Tera was in the midst of completing substance abuse counseling but had several weeks of treatment remaining. Although she had completed her mental-health evaluation in February 2016, she had not yet received any recommendations for treatment.[5] Tera, along with Robert, was scheduled to attend her first parenting class the day of the termination hearing.

Robert had made similar progress. He completed a substance-abuse evaluation and participated relatively consistently in the recommended treatment. Like Tera, he had not yet completed his substance-abuse treatment. But unlike Tera, Robert's drug screens in the six months preceding the hearing were negative. Robert had scheduled but not yet completed a psychological evaluation and a parenting assessment at the time of the hearing.[6] He reported

---

[5] Tera testified when she called the doctor's office to get a copy of her evaluation, she was told she needed to "go through [the] DHS." The doctor who performed the evaluation did not send a report of his recommendations to the DHS until the day before the termination hearing. Tera's attorney, who had not had the opportunity to review the report before the hearing, objected to its admission. The court sustained the objection.

[6] Robert had completed a psychiatric evaluation in 2014 at the recommendation of the DHS. The DHS case manager testified this evaluation did not meet Robert's court-ordered requirement because it was a psychiatric evaluation rather than a psychological evaluation and Robert had discontinued services with the provider who completed the evaluation.

attending "Dads Against Drugs" meetings, but he was unable to provide documentation of his attendance.[7]

The State presented testimony from DHS case manager Gina Ruma and FSRP provider Bria Clark at the termination hearing. Ruma's primary concern with Tera and Robert was their failure to complete the court-ordered requirements. She testified Tera had not yet provided a clean drug sample, neither parent had complied with the court-ordered services until shortly before the termination hearing, and they lacked transportation—all of which prevented Tera and Robert from progressing past supervised visitation.

Clark, who supervised the visitations between Robert, Tera, and the children, testified the parents were consistent in their visitation and the visits generally went well. But there had been some arguments between the parents in front of the children—"raised voices mostly about the interaction that's happening with the kids there"—during the visitations, which Clark found concerning. She concluded both Tera and Robert "seem to have basic parenting skills but have to be prompted to utilize the skills." Despite their concerns, both Ruma and Clark testified to the strong bond between the parents and their children.

The guardian ad litem did not offer evidence or testimony at the hearing, nor did she submit a written recommendation concerning the termination of Tera and Robert's parental rights.

---

[7] Although he had earlier reported attending AA meetings, at the termination hearing, Robert testified he didn't know he was supposed to be attending AA meetings. But Robert consistently maintained he had been attending "Dads Against Drugs" meetings. He provided the court with a brochure describing the program.

Following the hearing, the juvenile court terminated the rights of both parents under Iowa Code section 232.116(1)(d) and (e). But the court dismissed the allegations under section 232.116(1)(f), reasoning: "[T]he State has failed to provide the [c]ourt with birth certificates for the children or any competent evidence concerning their dates of birth and age . . . ." The court acknowledged the strong bond between the children and their parents but noted: "Being bonded to one's children is not the same as being able to safely parent the children without the assistance of the Department of Human Services or Juvenile Court." Both parents now appeal.

## II.     Abbreviated Briefing by Mother's Counsel

The State argues we should decline to consider Tera's challenge to the sufficiency of evidence because "[s]he does not provide any specific legal issues" and "[h]er argument is too vague to address." *See EnviroGas, L.P. v. Cedar Rapids/Linn Cty. Solid Waste Auth.*, 641 N.W.2d 776, 785 (Iowa 2002) (noting random mention of an issue, without analysis or supporting authority, is inadequate to raise an issue for consideration on appeal). On appeal, Tera generally asserts the State failed to present clear and convincing evidence of the grounds for termination; she emphasizes her progress in substance-abuse treatment as well as her continued visits with her children. While we agree Tera's argument on appeal is quite cursory, we find her argument is sufficient to address the merits here, particularly considering the abbreviated briefing in

expedited parental termination appeals. *See* Iowa Rs. App. P. 6.201(1)(d); 6.1401-Form 5. Therefore, we proceed to the merits of the parents' claims.[8]

**III.    Analysis**

Tera and Robert first attack the sufficiency of the evidence supporting termination of their parental rights under Iowa Code section 232.116(1)(d). Under subsection (d), the State must prove, in relevant part:

> The court has previously adjudicated the child to be a [CINA] after finding the child to have been physically or sexually abused or neglected as the result of the acts or omissions of one or both parents, or the court has previously adjudicated a child who is a member of the same family to be a [CINA] after such a finding.

Under chapter 232, "physical abuse or neglect" is narrowly defined as "any nonaccidental physical injury suffered by a child as the result of the acts or omissions of the child's parent." *See* Iowa Code § 232.2(42). Due to the requirement of an abuse or neglect finding, the underlying grounds of the children's CINA adjudications have important legal implications in a termination based on section 232.116(1)(d). *See In re L.G.*, 532 N.W.2d 478, 480 (Iowa Ct. App. 1995).

Here, the juvenile court adjudicated M.S., R.M., and K.M. to be CINA under section 232.2(6)(c)(2)—which requires a finding the children have "suffered or [are] imminently likely to suffer harmful effects" due to the parent's failure to "exercise a reasonable degree of care in supervising" them—and (6)(n)—which requires a finding the child's parent's "mental capacity or condition, imprisonment, or drug or alcohol abuse results in the child not receiving

---

[8] The State also argues both parents failed to preserve error on the reasonable-efforts issue. Because we do not reach the issue of reasonable efforts in our analysis, we find it unnecessary to determine whether the parents preserved error.

adequate care." Neither of these subsections requires a finding of physical or sexual abuse or neglect. *See In re J.S.*, 846 N.W.2d 36, 41 (Iowa 2014). And because the juvenile court did not elect to make findings of abuse or neglect in its adjudication order, there is insufficient evidence to support termination under Iowa Code section 232.116(1)(d). *See In re J.S.*, No. 15-0425, 2015 WL 4233560, at *3–4 (Iowa Ct. App. July 9, 2015).

The court also terminated Tera and Robert's parental rights under Iowa Code section 232.116(1)(e), which allows for termination when a child who has been adjudicated a CINA has been removed from the parent's care for at least six consecutive months and the State proves with clear and convincing evidence "the parents have not maintained significant and meaningful contact with the child during the previous six consecutive months and have made no reasonable efforts to resume care of the child despite being given the opportunity to do so." "Significant and meaningful contact" includes

> the affirmative assumption by the parents of the duties encompassed by the role of being a parent. This affirmative duty, in addition to financial obligations, requires continued interest in the child, a genuine effort to complete the responsibilities prescribed in the case permanency plan, a genuine effort to maintain communication with the child, and requires that the parents establish and maintain a place of importance in the child's life.

Iowa Code § 232.116(e)(3). Tera and Robert contend they have maintained significant and meaningful contact with their children through visitation and made reasonable efforts to resume custody of their children by participating in the court-ordered services to the best of their ability.

We agree Tera and Robert maintained significant and meaningful contact with their children. They regularly attended their weekly visitation. *See In re*

*G.B.*, No. 14-1516, 2014 SL 6682456, at *3 (Iowa Ct. App. Nov. 26, 2014) (finding regular visitation to be a factor in support of a finding of significant and meaningful contact). And although Clark expressed concern about Tera and Robert's "raised voices" during visitation, she testified she observed no other concerning issues in the family interactions. Despite their limited financial means, Tera and Robert provided food and gifts for the children and paid for activities during the visits. *See id.* (considering parents' provisions to child in significant-and-meaningful-contact analysis). Finally, according to the testimony presented at trial, the children are strongly bonded to Tera and Robert. *See In re P.C.*, No. 16-0893, 2016 WL 4379580, at *3 (Iowa Ct. App. Aug. 17, 2016) (citing parent-child bond in support of a finding of significant and meaningful contact).

Moreover, we find Tera and Robert have made "a genuine effort to complete the responsibilities prescribed in the case permanency plan" and reasonable efforts to resume care of their children. *See* Iowa Code § 232.116(1)(e)(3); *see also In re T.S.*, 868 N.W.2d 425, 437 (Iowa Ct. App. 2015) (noting that while both requirements are necessary for the State to prove in a termination under subsection (e), "they are considered closely interconnected"). Although neither Tera nor Robert had completed their court-imposed requirements by the time of the termination hearing, they had shown meaningful signs of progress. Tera and Robert were in the midst of substance-abuse treatment at the time of the termination hearing and were scheduled to begin parenting classes. Robert was testing negative for illegal substances, and Tera's levels of THC were declining, according to the drug patch and urine samples she

submitted in the months leading up to the termination hearing.[9]  We find the State failed to meet its burden to prove termination under section 232.116(1)(e) by clear and convincing evidence.

Finally, because we may affirm the juvenile court "where any proper basis appears for the trial court's ruling, even [when] it is not one upon which the court based its holding," we consider termination under Iowa Code section 232.116(1)(f).  *See In re M.W.*, 876 N.W.2d at 221.  Under subsection (f), the court may terminate parental rights when there is clear and convincing evidence a child of at least four years of age who has been adjudicated a CINA has been removed from the parent's physical custody for at least twelve of the past eighteen months and cannot be returned to the custody of the child's parents at the time of the termination hearing.  As an initial matter, we disagree with the juvenile court's conclusion that because the State failed to provide birth certificates for the children, it failed to prove this ground of termination.  As the State points out, the children's birthdates appear in both the DHS reports and the

---

[9] We find this case is distinguishable from *In re T.S.*, 868 N.W.2d at 435–38, in which our court found a mother had not made reasonable efforts to resume care of her child despite regular visitation and participation in some of the recommended services, such as substance-abuse treatment and domestic-violence classes.  In *In re T.S.*, the mother's behavior revealed the services she participated in had given her "very little insight" about the dangers of domestic violence and substance abuse on her children. *See id.* at 435.  She lied about her past drug use, disagreed with her substance abuse counselor's recommendation of residential treatment and participated only in outpatient treatment, continued to see her abuser in violation of a no-contact order, and stated an intent to hide future domestic abuse events.  *Id.* at 435, 438.

Here, there is no evidence of Tera or Robert displaying similar concerning behaviors.  Although some of their failure to successfully complete the recommended services may be attributable to their own lack of follow through, there are other more understandable factors that have hindered their progress, such as Tera and Robert's lack of transportation and Tera's doctor's failure to provide the DHS with recommendations following her mental-health evaluation.  We think these distinctions justify a different result.

juvenile court's adjudication order. Considering that the parents have not contested the alleged birthdates, the State's evidence of the children's ages was sufficient. But we note K.M., who is two years old, does not fall within the scope of section 232.116(1)(f). Accordingly, we consider whether the State proved this ground of termination with clear and convincing evidence as to M.S. and R.M. only.

It is undisputed that M.S. and R.M. are at least four years old, have been adjudicated CINA, and have been outside the home for at least twelve of the last eighteen months. The remaining issue is whether the State proved the children could not have been returned to the custody of their parents at the time of the termination hearing. Reasoning the mother failed to properly present her argument on appeal, the State limits its argument to the father, contending: "Because of the father's failure to address his parenting deficiencies, it is clear that [R.M.] could not be returned to his father's care at the time of the termination hearing."

Acting without the benefit of a finding by the juvenile court on the issue, we disagree the State proved that contention. FSRP worker Clark cited only minor concerns regarding Tera and Robert's parenting abilities. The parents' inability to complete all the court-ordered services by the time of the termination hearing does not necessitate a finding the children could not be returned to their care. *See In re C.L.H.*, 500 N.W.2d 449, 453 (Iowa Ct. App. 1993), *overruled on other grounds by In re P.L.*, 778 N.W.2d 33, 39 (Iowa 2010) ("The failure of the parents to comply with DHS's case plan cannot be an independent ground to terminate parental rights."). And although Tera had not yet tested free of

marijuana at the time of the termination hearing, the State failed to link her marijuana use to any adjudicatory harm. *See In re M.S.*, ___ N.W.2d ___, ___, 2016 WL 6269904, at \*5 (Iowa Ct. App. 2016) (stating "the mere fact of [marijuana] use does not establish adjudicatory harm"). While we are not free of concerns regarding Tera and Robert's ability to care for their children, we find the State failed to meet its burden on this ground. Because the State did not offer clear and convincing evidence in support of the grounds alleged for termination, we reverse the order of the juvenile court.

**REVERSED AND REMANDED ON BOTH APPEALS.**

Mullins, J., concurs; Vogel, P.J., concurs in part and dissents in part.

**VOGEL, Presiding Judge.** (concurring in part, dissenting in part)

I agree with the majority that the State failed to prove the grounds to terminate the parents' rights under Iowa Code section 232.116(1)(d) or (e) (2016). As to paragraph (d), the record on appeal fails to disclose that the juvenile court previously made findings of abuse or "neglect" in the adjudicatory orders, even though the facts in the adjudicatory record suggest such a finding could have been made.[10] As to paragraph (e), the State failed to prove these "parents have not maintained significant and meaningful contact with the child[ren]." *See* Iowa Code § 232.116(1)(e)(3).

Turning to Iowa Code section 232.116(1)(f), I disagree with the majority this ground has not been met and would affirm the termination of the parental rights as to the two older children.[11] The age of the two older children is uncontested, as is the fact that these children have been adjudicated CINA and the amount of time they have spent out of the parents' care. However, unlike the majority, I would conclude because of the parent's lack of progress, the State proved the children could not be returned the parents at the time of the termination hearing.

----

[10] As the majority notes, section 232.2(42) narrowly defines "physical abuse or neglect" as "any nonaccidental physical injury suffered by a child as the result of the acts or omissions of the child's parent." If "neglect" were separately defined under section 232.2 to include conditions that place a child at risk of being injured or harmed, then section 232.2(6)(c)(2)—defining a child in need of assistance to include one "imminently likely to suffer harmful effects" due to a parent's failure to "exercise a reasonable degree of care in supervising" the child—could form the basis for terminating parental rights under paragraph (d).

[11] The youngest child was only two years old at the time of the termination hearing. Despite her age, the State failed to include paragraph (h) as a ground in its petition to terminate the parents' rights. *See* Iowa Code § 232.116(1)(h). Therefore, this dissent only applies to the two older children. I, like the majority, would reverse the termination with respect to the youngest child.

Even before the youngest child was born, the DHS was involved with this family due to unsanitary conditions in the home. Our record contains an October 2013 report from the DHS that documented the family home as follows:

> I observed the 2 bedroom, one [bathroom] home to be full of[] trash and dirty clothing everywhere. Food was smashed in the carpet in the living room and in the children's bedroom. One of the bedrooms appeared to be completely covered in dirty clothing. I also observed food and dirty dishes in the pile of clothing. Tera reported that this is where she would find the children's clothing. I noted that [M.S.] had gone to school that day but had gotten out early. He was wearing jeans that had fallen around his knees when he walked and a dirty t-shirt that was at least 2 to 3 sizes too big. It appeared that he needed a bath because his hair, hands, and face were dirty.
> The bathroom was also full of dirty clothing and dishes. The bathroom sink was full of dirty dishes. I observed a plastic tote that was also full of dirty dishes with food left on the plates. Gnats were flying around the bathroom.
> In the kitchen, dirty dishes and spoiled food was left out on the table and on the counter tops. Gnats were flying all over the kitchen and were on top of the spoiled food. A soiled diaper full of feces was left out and open on top of a garbage bag. [A] towel covered with feces was on the floor next to it.

Both parents admitted illegal drug use, the utilities to the home had been turned off, and the children were temporarily removed from the home. A few months later, the utilities were turned back on after public assistance was obtained, and the parents made strides to cleaning the home and providing the children with a safe environment. After agreeing to accept voluntary services, the children were returned to the parent's care. While we have the DHS report from this time, we do not have a child-in-need-of-assistance adjudication from the court.[12]

In January 2015, after the youngest child was born, the DHS again became involved with the family due to unsanitary conditions in the home and

---

[12] There is some indication in the record that this 2013 CINA proceeding was dismissed when the parents agreed to participate in services voluntarily.

reports the older two children were being locked in a bedroom for extended periods of time with no supervision, resulting in the older child abusing the younger child. Two months later, the children were all removed from the parents' home. At the time of their removal, the children were once again wearing dirty clothes and in need of baths. The parents admitted drug use throughout their involvement with the DHS. The conclusion that can be drawn from these interactions is that when these parents use illegal substances, they neglect the basic needs of their children. By the time of the termination hearing, the parents had been provided services for over three years. Despite reunification services being offered for this amount of time, the parents have been unable or unwilling to take advantage of the critical services that would enable them to parent these children safely.

In March 2016, both parents again tested positive for methamphetamine. Both were also arrested and found guilty of disorderly conduct. At the time of the termination hearing, Tera was still testing positive for illegal substances, she had not yet completed her counseling for substance abuse, and she had not even started her parenting classes. Robert, while he was testing negative for illegal substances, had not yet completed his substance-abuse treatment, had not completed his psychological evaluation or his parenting assessment, and was unable to provide support for his assertion he was regularly attending addiction support meetings.

The reports from the supervised visitation revealed that while the parents were receptive to the parenting skills instruction offered, they were unable to consistently use the skills they were taught as they needed "to be prompted to

utilize the skills." The assigned DHS worker noted in the final report to the court that the family has been receiving services for three years and the children cannot be returned their parents' care now or in the foreseeable future because of safety concerns, including "the parent's substance use, criminal court involvement, mental health issues, and lack of parenting skills." The report also noted the parents "struggle with parenting all of the children together" and have communication issues between themselves, which has resulted in heated arguments in front of the children during visitations.

While the parents have recently begun to make progress to work toward reunification with their children, I find the progress to be too little, too late.

> Once the limitation period lapses, termination proceedings must be viewed with a sense of urgency. Insight for the determination of the child's long-range best interests can be gleaned from "evidence of the parent's past performance for that performance may be indicative of the quality of the future care that parent is capable of providing."

*In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000) (citations omitted). The changes the parents made shortly before the termination hearing are insufficient in light of the three years of services—since September 2013—this family has received. Considering the past behavior of the parents and their inability to demonstrate sustained progress, there is no reasonable basis to conclude the children will be able to be returned to their care. "Time is a critical element. A parent cannot wait until the eve of termination, after the statutory time periods for reunification have expired, to begin to express an interest in parenting." *Id.*

As the district court noted it is termination order:

> These parents have had a considerable amount of time to conquer their substance abuse problems, their lack of parenting

skills, their inability to have a home where there is enough room for them and the children,[13] and still continue to struggle with substance abuse issues.

Clearly, the children are bonded to these parents. However, it is not in the best interest of the children for them to wait for an indeterminate amount of time for these parents to be capable of parenting the children. Being bonded to one's children is not the same as being able to safely parent the children without the assistance of the Department of Human Services or Juvenile Court. The parents still are not able to adequately parent the children during the supervised visitations they have with them.

In light of the extensive services these parents have been provided over the course of three years, I agree it was in the children's best interests to terminate the parents' rights in this case. The children are bonded with their foster families, and they deserve permanency in their lives. *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) ("[O]ur legislature has carefully constructed a time frame to provide a balance between the parent's efforts and the child's long-term best interests. We do not 'gamble with the children's future' by asking them to continuously wait for a stable biological parent, particularly at such tender ages." (citations omitted)).

I would therefore affirm the termination of the parents' rights with respect to the two older children. However, because the State did not plead Iowa Code section 232.116(1)(h) in its petition to terminate the parental rights, which would have applied to the youngest child, I agree with the majority that the termination order with respect to the youngest child must be reversed.

---

[13] The parties reside in a one-bedroom apartment.